**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

**CAROL MELTON,**

                          **Plaintiff,**

        **-against-**

**POUGHKEEPSIE CITY SCHOOL DISTRICT**

                        **Defendant.**
_____

**AFFIDAVIT IN SUPPORT**
**OF MOTION FOR SUMMARY**
**JUDGMENT**

**Civil Action No. 16-CV-09701**
**(VJB)(LMS)**

**STATE OF NEW YORK**   **)**
**COUNTY OF GREENE**    **) s.s.:**

      DR. RONEL COOK., being duly sworn and under oath, hereby deposes and says:

1.    I am currently the Superintendent of Schools for the Catskill Central School District, having been appointed to that position on July 1, 2017. Prior to that appointment, from 2015 through 2017, I was the Deputy Superintendent for Operations at the Poughkeepsie City School District (hereinafter "District"). From January of 2013 to 2015, I was the Assistant Superintendent for Human Resources for the District. I was the Director of Human Resources for the District from July of 2011 through December of 2012. In each of these positions I had substantial responsibilities for the human resources functions of the District. I also served as a building principal in the District's schools from September 2006 through June 2011, including as principal of Morse Elementary School ("Morse") commencing in 2006 and of the Clinton Elementary School ("Clinton") during the 2009-10 school year. I also served as a teacher in the District from September 1996 through June 2002. As such, I am fully familiar with the facts set forth herein.

1

2. I am an African-American male.

3. Plaintiff Carol Melton (hereinafter "Melton") is a teaching assistant who was employed by the Poughkeepsie City School District for a number of years through to the time of my cessation of employment by the District.

4. During the 2014-15 school year, Melton was employed as a teaching assistant at the District's Clinton Elementary School ("Clinton"). Among the other teaching assistants employed during the 2014-15 school year at Clinton was Maria Brown ("Brown").

5. During the 2009-10 school year, Brown was already employed as a teaching assistant at Clinton, but Melton was not yet employed at that school. As of the conclusion of the 2014-15 school year, Brown had been employed as a teaching assistant at Clinton longer than Melton, but had less total years of service as an employee of the District than Melton.

6. Prior to the 2015-16 school year, Melton had served as a teaching assistant at the District's middle school and, following her assignment as a teaching assistant at Clinton, had run the computer program for that school.

7. During Brown's career with the District, Brown had served as a teaching assistant only in elementary schools and had never served as a teaching assistant in a middle school or high school. As of the conclusion of the 2014-15 school year, Brown had a substantially lower skill level than Melton when it came to instructing and assisting students in the use and operation of educational technology. Melton also possessed superior student discipline skills.

8. The Circle of Courage School ("The Circle"), also later known as the P.A.C.E Academy, was a school providing an experimental educational program known as the

PEACE Program, for disruptive students in grades 7 through 12. The Circle had no special education classes.

9.   The principal of The Circle during the summer of 2015 school year was Jason Gerard. Principal Gerard made known to me during the summer of 2015 that he had concerns regarding The Circle's student body's ability to utilize educational technology, especially in light of the disruptive student makeup of that student body, and that he was seeking a skilled technology teacher with good student management skills to serve that student body for the 2015-16 school year. After advising Principal Gerard that the District had not budgeted for, and could not afford to hire and provide for, such a teacher for The Circle for the 2015-16 school year, I made known to Principal Gerard that I was aware of a teaching assistant, Melton, who both had excellent technology skills as well as good student management skills. Principal Gerard and I agreed that Melton should be reassigned from Clinton to The Circle for the above programmatic reasons. Her role at The Circle would be similar to that she had served in running the computer program at Clinton.

10.   By memo dated August 24, 2015 (Exhibit A submitted herewith), I thereupon notified Melton that she would be assigned to The Circle effective September 1, 2015.  Later, when I spoke with Melton about her being reassigned to The Circle, she expressed agreement to the reassignment.

11.   As a general practice, for as long as I have been employed by the District, teachers and teaching assistants in the District who are assigned to an after-school or extended school year program at a school building, are reassigned upon application to the same position in that after-school or extended school year program in that building in

subsequent school years without regard to their respective lengths of service with the District unless they are negatively evaluated by the supervisor of the program, do not seek reappointment to the position or leave employment with the District.

12.   I was made aware during the summer of 2015 that Melton had served during the 2014-15 school year as a teaching assistant in the 21st Century Community Learning Centers After-School and Saturday program ("21st Century Program") at Clinton and I discussed arrangements with Principal Gerard by which Melton could be provided with an early release at The Circle so that Melton would be enabled to timely arrive for and serve as a teaching assistant in the 21st Century Program at Clinton, which would start in October of 2015, should she apply for same. There was no such program at The Circle.

13.   Melton was the only teaching assistant employed by the District in September 2015 who was not assigned to a mandated classroom (i.e., a special education class requiring one or more teaching assistants pursuant to student individual education plans).

14.   On or about September 13, 2015, I was notified by Morse Principal Nadine Dargan that she was in need of a teaching assistant for a special education mandated class taught by teacher O'Leary at Morse. As the only teaching assistant in the employ of the District at that time who was not already assigned to a mandatory classroom, Melton was the only available teaching assistant who could be reassigned to work in O'Leary's mandated class at Morse. In response to Principal Dargan, on September 13, 2015, I advised her that effective September 14, 2015, Melton would be transferred from The Circle to Morse. See email stream at Exhibit B hereto. By email on September 13, 2015

(submitted herewith as Exhibit C), I notified Melton that effective immediately she was being transferred from The Circle to Morse for the 2015-16 school year.

15. Like the reassignment of Melton to The Circle, her reassignment to Morse to serve as a teaching assistant in a mandated classroom at Morse was made for programmatic reasons.

16. As I had with Principal Gerard, I secured Morse Principal Nadine Dargan's agreement to allow Melton to leave work early so that she could serve as a teaching assistant for the 21st Century Program at Clinton when it commenced in October of 2015.

17. Principal Dargan is African-American.

18. Neither reassignment of Melton made for the 2015-16 school year had anything to do with Melton's race. Melton was the most qualified teaching assistant who could meet the needs of The Circle as expressed to me by Principal Gerard and, by September 14, 2015, all other teaching assistants were already working in mandated classrooms, leaving Melton as the only available teaching assistant who could be used to meet the mandated classroom requirement of assigned teaching assistant(s) for O'Leary's classroom on September 14, 2015.

19. Melton was not the only teaching assistant involuntarily reassigned by me. To the best of my recollection, for that same 2015-16 school year, Caucasian/Hispanic teaching assistant Nilsa Ortiz was involuntarily transferred from Clinton for programmatic reasons to the Early Learning Center ("ELC") for pre-Kindergarten and Kindergarten. Her length of service with the District, rendering her senior to many other teaching assistants who were not subjected to an involuntary transfer in the year involved, did not insulate her from that involuntary transfer.

20. At the request of Ms. O'Leary, Melton was removed from her classroom at Morse in December of 2015. Teachers in the District have the right to refuse to accept a teaching assistant who is assigned to their class. At that point, another teaching assistant had become available to serve in O'Leary's class.

21. In January of 2016, I was in contact with Vijay Giles, the new principal of The Circle/P.A.C.E. Academy. Principal Giles was then requesting that we reassign Melton to The Circle and I spoke with Melton who declined such a return to The Circle. As per my email exchange with Principal Giles on January 10 and 11, 2018, submitted herewith as Exhibit D, while I could have ordered Melton's return to The Circle at that time for programmatic reasons, I did not want to order her to go to The Circle against her will after she had already been reassigned twice in September of that school year and, as set forth below, was already precluded from working the 21st Century Program at Clinton as a result of her earlier reassignments. Melton was allowed to remain at Morse.

22. According to the Morse schedule for Melton in place in September 2015, Melton was scheduled to work at Morse from 7:50 AM until 2:45 PM. See Exhibit E submitted herewith. The 21st Century Program at Clinton, which paid overtime pay for an assigned teaching assistant in that program was scheduled to start during the regular work week at that building at 2:35 PM. In anticipation of Melton being enabled to return as a teaching assistant for the Clinton 21st Century Program commencing in October 2015, I contacted then Superintendent of Schools Dr. Nicole Williams to work out the details of permitting Melton to adjust her schedule at Morse so that she could serve as a teaching assistant at Clinton in that afterschool program.

23. Dr. Williams, who is African-American, had been appointed as Superintendent of the District on July 1, 2013, and had no prior experience working in the District.

24. Dr. Williams asked me to be provided with Melton's schedule at Morse and, upon review of same, advised me that because Melton was scheduled to be on duty at Morse until 2:45 PM, Melton would not be available to start work at Clinton at the start of the 21st Century Program at 2:35 PM. After I advised Dr. Williams that this only required that the person responsible for supervising the Clinton 21st Century Program be made aware that Melton would not be available to start her duties until 2:50 PM and that a similar accommodation had been made for another staff member (which was done before Dr. Williams had joined the District), Dr. Williams wrote to me via email, the stream of which is submitted herewith as Exhibit F, the following:

> I apologize if there are discrepancies from past practice. I can't comment on previous practices in the District. My goal is to ensure that we have fair and consistent practices moving forward that are not arbitrary or capricious. We are responsible for the culture of the organization. To this end, we cannot grant staff members early leave time from their regularly scheduled assignments to travel to work in another program for extra service pay. It is an illegal practice to be paid, in this case, through 2:50 PM on regular time and be paid starting at 2:35 PM, on overtime or extra service time. We cannot condone this practice. At this time, Mr. Scott [Clinton's principal] will use a current employee from Clinton who is qualified and has applied for this position. Please work with Mr. Scott to ensure that appropriate human resources actions are implemented. I appreciate your support.

25. Brown, a teaching assistant at Clinton was, consequently chosen by Clinton Principal Scott from the teaching assistant applicants at Clinton to serve as the Clinton 21st Century Program teaching assistant for the program period of October 13, 2015 to June 14, 2016 and that appointment was subsequently approved by the Board of Education. Melton was selected as a substitute to fill any teaching assistant vacancy that might

arise in any District school providing the 21st Century Program (i.e., Clinton, Kroeger, Morse, or Warring elementary schools or the Poughkeepsie Middle School). See Exhibit G submitted herewith.

26. On November 2, 2015, Melton filed a grievance under the collective bargaining agreement between her union and the District, alleging that the District had violated the collective bargaining agreement by making an "involuntary transfer for non-programmatic reason, and when it failed to consider Seniority as the most important factor in making such a transfer." A copy of that grievance, together with the collective bargaining agreement, is submitted herewith as Exhibit H. As far as I can recall, neither Melton nor her union submitted a separate grievance concerning her non-selection for a teaching assistant position in the 21st Century Program.

27. On November 20, 2015, by a Stage II Response to that grievance, submitted herewith as Exhibit I, I responded to Melton's grievance, regarding its merits, as follows:

> [T]he contract provides at Article IX "Seniority and Reductions in Force" that "The employer shall have the authority to make involuntarily transfers when deemed necessary by the District for programmatic reasons". The transfers in question were made for programmatic reasons. Specifically, the September 1, 2015 transfer was made to support the student management needs at the Peace Program at the Circle of Courage School. Ms. Melton was transferred from the Circle Courage School to the Morse Elementary School on September 13, 2015 to meet the legally mandated requirements of a special education classroom,

28. Melton's union did not thereafter submit this grievance to arbitration under the terms of the collective bargaining agreement.

29. Once Brown became the incumbent teaching assistant appointed to the 21st Century Program at Clinton for the 2015-16 school year, the District-wide practice would be for her principal to recommend reappointment of Brown to that position in subsequent

school years so long as she applied for same and did not receive disqualifying evaluations for her performance in that program, and for the Board of Education to confirm such appointments. As Melton had not served as a teaching assistant in the 21st Century Program at Morse, so long as the incumbent in that position served as the 21st Century Program teaching assistant during the 2014-15 school year, that teaching assistant – Sarah Herman -- would be and was reappointed for the succeeding 2015-16 and 2016-17 school years. Ms. Herman also had more years of service in the District than did Melton.

30. Reassigning a teaching assistant in a school building to different duties in that school building would be a decision within the jurisdiction of the school building principal. Seniority, whether District-wide or building-wide, has never played a roll in such reassignment of teaching assistant duties.

31. The District has a computer program known as AESOP by which staff reports when they are not coming to work and provide the reason therefore. That information gets placed into a web-based management system, from which a summary sheet involving any staff member can be produced.

32. During the 2015-16 school year, I had assigned to District Personal Assistant Sheryl Small the duty of monitoring the use of union business time by union representatives of collective bargaining units in the District.   The collective bargaining agreement covering Melton's employment provides at Article VIII, section 13 thereof that each school year, the Association President or his/her designee, all union officers and shop stewards shall be entitled to up to 12 one-half days off, with pay, for the purpose of conducting or participating in union business, but only 4 of such half days may be used

by union officers other than the union president.

33. In or about mid-June 2016, Ms. Small provided to me a summary report, a copy of which is provided herewith as Exhibit J showing that Melton had reported having taken 3 ½ days of union business leave, comprised of one half a day on May 23, 2016 and full days on June 8, 9 and 10, 2016. As it was my understanding that Melton was neither a union officer nor shop steward during the 2015-16 school year, on June 20, 2016, I tasked Ms. Small to follow up with Melton as to the justification for her having taken 3.5 union business days. On June 21, 2016, by email sent at 8:54 AM, a copy of which is submitted herewith as Exhibit K, Ms. Small advised me that she had spoken with Melton that morning about her use of union business time and that she was not entitled to use it; that she would be docked her pay for those 3.5 days. Ms. Small also therein informed me that she had checked Melton's time records going back to the 2011-12 school year and for the ensuing school years and that Melton's record did not reflect Melton using union business days during that school year or in the ensuing school years.

34. By email at 8:36 PM on June 21, 2016, a copy of which is provided herewith as Exhibit L, I advised Melton that I needed certain information from her concerning her claim to entitlement to utilize 3.5 union business days. In the interim, I spoke with Leslie Callis, then president of Melton's union, who advised me that Melton was not a union officer or shop steward authorized to use union business time.

35. As reflected by Melton's response to my June 21, 2016 email, also at Exhibit L, Melton claimed entitlement to paid union business days. She raised no claim that any of the 3.5 days were not used for union business (i.e., that it should be credited to some other

leave entitlement).

36. On June 29, 2016, Melton filed a grievance, a copy of which is submitted herewith as Exhibit M, claiming that the District had violated Articles VII and VIII of the collective bargaining agreement by failing to pay Melton for conducting union business when she utilized union business days. Melton did not claim in her grievance that she had not utilized union business days for all of the 3.5 days for which her pay had been docked.

37. On July 13, 2016, I rendered a Stage II Response, a copy of which is submitted herewith as Exhibit N, denying Melton's grievance, by memo to Leigh Ann Ciferri, the new president of Melton's union on the basis that Melton did not hold a position in the union and was not authorized to use union business days to file grievances.

38. Melton's union did not submit her union business days grievance to arbitration.

39. Attached hereto as Exhibit O is an email dated October 24, 2016 from Leslie Callis, president of Melton's union in June 2016 to incumbent union president Ciferri, addressed "To Whom It May Concern" confirming that "Melton was not a Bldg, Rep., Shop Steward, or Chair of any committee, when she used 3.5 Union Business Days."

40. The decision to dock Melton for 3.5 days of pay had nothing to do with her race, and everything to do with the fact that she had recorded herself as having taken 3.5 union business days; was not, as a matter of contract and according to her union, entitled to take union business days; was paid for those days; her union had declined to press her grievance toward arbitration and allowing her to retain the pay for those days would be a gift of public funds.

41. Counsel for the District has advised me that during her deposition, Melton claimed that District employee Maryann Baker was not a certified teaching assistant and should not

have been considered for, and granted, teaching assistant after-school, summer or extended school year assignments where Melton might have applied for those assignments. The fact is that Ms. Baker and Doreen Henry each had started out as teacher aides for the District decades ago and had been grandfathered as teaching assistants when the certification requirements had changed for their duties. As a consequence, Baker and Henry were deemed to be 2 of the most senior "teaching assistants" in the District. I am aware that Ms. Baker has been regularly assigned to paid "teaching assistant" summer programs (i.e., extended school year or "ESY") for more than 30 years.

42. Melton was granted an appointment on or about February 24, 2016 to a paid teaching assistant assignment for the "Spring Break Academy" at the District's middle school through a School Improvement Grant for the period of March 21, 2016 to March 24, 2016. See Exhibit P submitted herewith. Despite her being placed as a substitute for an after-school program, I am aware that Melton has been paid on an overtime basis for serving as a teaching assistant as a substitute during the 2015-16 school year. See Exhibit Q submitted herewith.

43. Melton had, over the years that I served in higher level administrative positions with the District, applied for multiple non-teaching assistant positions in the District. While her applications were entertained, she was regularly denied consideration because she did not meet the minimum qualifications for those positions. Those minimum qualifications appeared in each posting of a position at the District. During the period that I served as the Deputy Superintendent for Operations, Assistant Superintendent for Human Resources and Director of Human Resources for the District, the District had never

12

appointed a person to a position for which the appointee did not meet the minimum qualifications for the position, including having the required State certifications.

44. Counsel for the District has advised me that during her deposition in this action, Melton made a point of contending that she was entitled to consideration for various positions that would have required that she possess a Transitional D certificate as an avenue to meet the minimum qualifications for the position, possession of which may permit the District's employment of an individual as a school district leader for purposes of employment in administrative or supervisory positions. Examples of District positions to which Melton applied for which an applicant's possession of a Transitional D certificate would allow the applicant to potentially meet the minimum qualifications for the position were (1) the position of Assistant Principal for which Melton was applying in July of 2016; (2) the position of Dean of Students at the Poughkeepsie Middle School, for which Melton applied in June of 2015; (3) the position of Director for Family and Community Engagement for which Melton applied in January of 2016. The postings setting forth the qualification requirements for those positions are annexed hereto as Exhibit R.

45. According to the New York State Education Department, see Exhibit S submitted herewith, the individual seeking a Transitional D certificate "must be enrolled in a New York State Transitional D program." At the time that Melton was applying to the positions identified above, she had already advised me that she had left the Transitional D program she had been enrolled in at Niagara University, one of the two New York State accredited universities that offer coursework which leads to a Transitional D certification, without completing it because of the cost of the program.

46.  As per the email streams attached hereto at Exhibit T, as to each of the positions identified above, I advised Melton that I required her to advise me of the accredited college or university which she was attending to acquire a Transitional D certificate or of her possession of such a certificate as her State certification record (i.e., "TEACH") did not reflect her possessing such a certificate. As per those same email streams, Melton never advised me that she had returned to the requisite Transitional D certification program at Niagara or had enrolled in the program at New Paltz, but instead kept insisting that the District had to offer her a position first. That was then, and remains, contrary to my understanding. Rather, the student in attendance at the college or university providing the Transitional D program must first make application to that institution for a recommendation/endorsement, whereupon the college or university makes the recommendation/endorsement to the New York State Education Department. That recommendation/endorsement for a Transitional D certificate is recorded in TEACH, whereupon the District can consider making an offer to appoint the applicant.

47.  Counsel for the District advises me that during her deposition in this action, Melton claimed that a "Caucasian", Natasha Cherry, who had been in the same Transitional D certification class at Niagara University as she, had also not completed the program at Niagara and did not have a Transitional D certification at the time of her appointment to the position of Director for Family and Community Engagement. Firstly, I know Ms. Cherry and she is not "Caucasian". Like Melton, who has advised me she is of Asian and African-American heritage, Ms. Cherry is of mixed race. She has a light brown

complexion reflecting an African-American background and, upon information and belief, is a combination of African-American and Italian parentage. Secondly, as evidenced by Ms. Cherry's TEACH system record, a copy of which is submitted herewith as Exhibit U, Ms. Cherry has possessed a Transitional D certificate (which is good for 5 years) since July 17, 2014. Further, she had served in an administrative position similar to that of Director for Family and Community Engagement for the District in 2015. Thus, in January of 2016, she already had the minimum qualification that Melton lacked for that vacant position as well as experience related to that position which Melton lacked. Ms. Cherry was awarded the position of Director for Family and Community Engagement.

48.     Submitted herewith as Exhibit V is the TEACH system record for Melton which I had reviewed when responding to her inquiries concerning various positions for which she would have needed at least a Transitional D certification to meet the positions' minimum qualifications.

Dr. Ronel Cook

Sworn to before me this
20 day of November, 2018

Notary Public

SHAWNA M. POST
Notary Public, State of New York
No. 01PO6127072
Qualified in Greene County
Commission Expires May 23, 20 21

**Exhibit A**

## POUGHKEEPSIE CITY SCHOOL DISTRICT
## OFFICE OF HUMAN RESOURCES

### MEMORANDUM

TO:    Ms. Carol Melton
FR:    Dr. Ronel Cook, Jr.
RE:    Notice of Assignment
DT:    August 24, 2015

Please be aware that your assignment as a teaching assistant in the Poughkeepsie City School District, effective Tuesday, September 1, 2015, is as follows:

| School Year | Assignment |
|---|---|
| 2015-2016 | COC-PEACE Program |

Thank you for your attention to this matter.

c:    Mr. Jason Gerard
      Personnel File

Phone: 845.451.4975                                    Fax: 845.451.4904
                Email: rcook@poughkeepsieschools.org

**Exhibit B**



1/13/2017

Poughkeepsie City School District Mail - Re: Health Aides

Dr. Ronel Cook <rcook@poughkeepsieschools.org>

## Re: Health Aides
1 message

On Sun, Sep 13, 2015 at 5:15 PM, Dr R Cook <rcook@poughkeepsieschools.org> wrote:

Ms. Dargan,

As previously stated, the fingerprinting process is delaying the one to one coverage issue. Ms. Schinella will work with you to make sure that Ms. Dean Cummings is given a different assignment and other TA related matters.

Effective Monday, September 14, 2015, Ms. Carol Melton will be transferred from the COC Program to Morse School.

Sent from my iPhone

https://mail.google.com/mail/ca/u/0/?ui=2&ik=3f68dcf0f19&view=pt&q=carol%20melton&qs=true&search=query&th=14fc8ef4353a4cd&siml=14fc8ef4353a4cd   1/3

1/13/2017                                                    Poughkeepsie City School District Mail - Re: Health Aides

On Sep 13, 2015, at 3:42 PM, Nadine Dargan <ndargan@poughkeepsieschools.org> wrote:

Any information on an aide for ██████? Ms. Cummings didn't show last week, so I'm struggling to cover this students.

Also ██████ Mom wanted her pick who has not reported yet either? HELLLLLLLLLLLP!!!!!!

Dr. Cook,

I'm still short a Teaching Assistant for Ms. O'Leary's class. Any plans there?

--
*Nadine Dargan*
Principal
**S.F.B. Morse Elementary School**
845-451-4890 Office
845-451-4701 Fax
ndargan@poughkeepsieschools.org

*"As long as the Ties that Bind us Together are stronger than those that pull us apart; We Will Effect Change"*

Sincerely,

*Felicia Schinella*

**Director of Special Education**
Poughkeepsie City School District
fschinell@poughkeepsieschools.org
(845) 437-3475

*"Teamwork makes the dream work"*
*"Every child. Every day. Every classroom"*

The information transmitted is intended only for the person(s) to whom it is addressed. Any re-transmission, dissemination or other use of this information by persons(s) other than the intended recipient is prohibited. This note is not to be distributed without the original sender's permission.

--
Sincerely,

000119

**Exhibit C**



Dr. Ronel Cook <rcook@poughkeepsieschools.org>

## Transfer of TA Assignment
1 message

**Dr R Cook** <rcook@poughkeepsieschools.org>                              Sun, Sep 13, 2015 at 5:49 PM
To: Carol Melton <cmelton@poughkeepsieschools.org>
Cc: "Dr. Ronel Cook" <rcook@poughkeepsieschools.org>, "Dr. Nicole Williams" <nwilliam@poughkeepsieschools.org>, Nadine Dargan
<ndargan@poughkeepsieschools.org>, David Scott <dscott@poughkeepsieschools.org>, Jason Gerard <jgerard@poughkeepsieschools.org>
Bcc: ralph.coates2@gmail.com, charter1986@hotmail.com

Ms. Melton:
Effective immediately, you are being transferred from the COC PEACE Program to Morse School for the 2015-16 school year.

Please report to Morse School tomorrow morning at 7:45am to review your building level assignment with Principal Dargan.

Regards,
R.Cook
Sent from my iPhone

**Exhibit D**

Sean Daneshvar

| From: | Dr. Ronel Cook <rcook@poughkeepsieschools.org> |
|-------|------------------------------------------------|
| Sent: | Monday, January 11, 2016 2:09 PM |
| To: | Dr. Vijay Giles |
| Cc: | Dr. Nicole Williams; Dr. Ronel Cook |
| Subject: | Re: PACE Academy Schedules |

Dr. Giles,

Thank you for the update. I have been working non-stop with trying to convince Ms. Melton to return to the Circle. The conversations started last week. I am in the process of placing letters into Teaching Assistants' mailboxes to inquire if anyone else would be interested in being reassigned to the Circle. Legally, I could transfer Ms. Melton to the Circle for programmatic reasons, but am trying to be delicate and non-aggressive with the situation. I want to respect her feelings.

On another note, I would prefer to have an experienced Teaching Assistant assigned to your building instead of you hiring a new person for this role. Let's discuss on Wednesday. The decision will be made no later than Wednesday of this week so that this person can be prepared to start on Monday.

Regards,
Dr. Cook

On Sun, Jan 10, 2016 at 6:42 PM, Dr. Vijay Giles <vgiles@poughkeepsieschools.org> wrote:
  Good evening Dr. Cook,

Attached you will find the schedules "cleaned up" by Mr. Gerard to reflect the schedule changes we discussed with Mrs. Simpson. As you already know, Mr. Moffett can only teach periods (6 & 7) of physical education due to contractual factors such as a 45 minute lunch and 30 minute travel time. Hence he teaches middle school 6th period and high school 7th period.

My major concern is for (1) the study hall periods (1, 2, 3, 4, 5 and 7) that do not have any teacher coverage and (2) resigning Ms. Cerulo who used to covered several of these study hall sections as well as an 8th period Career Explorations class scheduled to begin the second semester. As such I am requesting a substitute teacher. Please note that Mr. Gerard suggested either Danielle Atkins or Carol Melton (Mrs. Melton is a very reliable "Tech" person who will be ideal to collaborate and work with students and teachers). However, my preference is Mrs. Melton.

Please advise and thank you.

Best regards,
Vijay

*Dr. Vijay Giles*
Principal
P.A.C.E Academy

**Exhibit E**

# Mrs. Carol Melton
## 2015-2016

| |
|---|
| **7:50 – Staff Arrival**<br>**7:50 – 8:00 – Arrival Supervision**<br>Morse Cafetorium |
| **1st Period**<br>**8:00 – 8:40**<br>Ms. O'Leary- Room 209 |
| **2nd Period**<br>**8:40 – 9:20**<br>Ms. O'Leary- Room 209 |
| **3rd Period**<br>**9:20– 10:00**<br>Ms. O'Leary- Room 209 |
| **4th Period**<br>**10:00 – 10:40**<br>Ms. O'Leary- Room 209 |
| **5th Period**<br>**10:40 – 11:20**<br>(1st Lunch Period- Lunch *Supervision in Cafeteria*) |
| **6th Period**<br>**11:20– 12:00**<br>Ms. O'Leary- Room 209 |
| **7th Period**<br>**12:00 – 12:40**<br>*(LUNCH - Please sign out if you are leaving the building.)* |
| **8th Period**<br>**12:40 –1:20**<br>Ms. O'Leary- Room 209 |
| **9th Period**<br>**1:20 – 2:00**<br>Attend Special Class with Ms. O'Leary's Students |
| **10th Period**<br>Homebase<br>**2:00 – 2:25**<br>Ms. O'Leary- Room 209<br>**2:25 – 2:45**<br>Dismissal Supervision- Morse Cafetorium |

**Exhibit F**



Dr. Ronel Cook <rcook@poughkeepsieschools.org>

## Fwd: Ms. Carol Melton's Teaching Assistant Schedule at Morse
1 message

**Dr R Cook** <rcook@poughkeepsieschools.org>                                      Thu, Sep 24, 2015 at 11:27 AM
To: "Dr. Ronel Cook" <rcook@poughkeepsieschools.org>

Sent from my iPhone

Begin forwarded message:

> **From:** "Dr. Nicole Williams" <nwilliam@poughkeepsieschools.org>
> **Date:** September 24, 2015 at 4:51:40 AM EDT
> **To:** "Dr. Ronel Cook" <rcook@poughkeepsieschools.org>
> **Cc:** "Dr. Nicole Williams" <nwilliam@poughkeepsieschools.org>
> **Subject: Re: Ms. Carol Melton's Teaching Assistant Schedule at Morse**
>
> Thank you, Dr. Cook. I apologize if there are discrepancies from past practice. I can't comment on previous practices in the District. My goal is to
> ensure that we have fair and consistent practices moving forward that are not arbitrary or capricious. We are responsible for the culture of the
> organization. To this end, we cannot grant staff members early leave time from their regularly scheduled assignments to travel to work in another
> program for extra service pay. It is an illegal practice to be paid, in this case, through 2:50 pm on regular time and be paid, starting at 2:35 pm, on
> overtime or extra service time. We cannot condone this practice. At this time, Mr. Scott will use a current employee from Clinton who is qualified
> and has applied for this position. Please work with Mr. Scott to ensure that appropriate human resources actions are implemented. I appreciate your
> support.
>
> Sincerely,
>
> Dr. Nicole Williams
> Superintendent of Schools
> Poughkeepsie City School District
> (845) 451-4950 (W)
> (845) 391-6221 (C)
> Email: nwilliam@poughkeepsieschools.org
>
> "Every child. Every day. Every classroom."
> "Teamwork makes the dream work."
>
> Sent from my iPhone
>
> On Sep 23, 2015, at 8:39 AM, Dr. Ronel Cook <rcook@poughkeepsieschools.org> wrote:

Dr. Williams,
This issue is similar to the Sakina Green Brown, former District Family Advocate, experienced two years ago. She was employed during the school day as an advocate and worked at the PMS Empower Program after work hours. I do not know the other parties involved in this issue and their agenda, but there needs to be consistency on how we treat our employees. This issue has discrimination written all over it and I am requesting clear written direction moving forward.

R.Cook

On Wed, Sep 23, 2015 at 8:30 AM, Dr. Ronel Cook <rcook@poughkeepsieschools.org> wrote:
| Dr.

So the person whose responsible for supervising the Clinton School after school program should know that Ms. Melton will be available to start her duties at 2:50pm.

On Tue, Sep 22, 2015 at 9:24 PM, Dr. Nicole Williams <nwilliam@poughkeepsieschools.org> wrote:
| Thank you, Dr. Cook. According to the attached schedule, she is still on duty at Morse at 2:45 PM, she would not be available to
| start work at Clinton at the start of the program at 2:35 PM.

Sent from my iPhone

On Sep 22, 2015, at 5:44 PM, Dr. Ronel Cook <rcook@poughkeepsieschools.org> wrote:

Dr. Williams,
You will find Ms. Melton's 2015-16 Teaching Assistant schedule attached to this email. Please advise.
R.Cook

———— Forwarded message ————
From: **Nadine Dargan** <ndargan@poughkeepsieschools.org>
Date: Tue, Sep 22, 2015 at 4:47 PM
Subject: Re: Ms. Carol Melton's Teaching Assistant Schedule at Morse
To: "Dr. Ronel Cook" <rcook@poughkeepsieschools.org>

Schedule attached. Lunch time may vary

On Tue, Sep 22, 2015 at 2:58 PM, Dr. Ronel Cook <rcook@poughkeepsieschools.org> wrote:
| Ms. Dargan,
| As per our conversation, I need you to forward us Ms. Carol Melton's 2015-16 schedule as soon as possible.

Thanks,
R.Cook

--
Dr. Ronel Cook
Deputy Superintendent for Operations
Poughkeepsie City School District

11 College Avenue
Poughkeepsie, NY 12603

--
*Nadine Dargan*
Principal
**S.F.B. Morse Elementary School**
845-451-4690 Office
845-451-4701 Fax
ndargan@poughkeepsieschools.org

*"As long as the Ties that Bind us Together are stronger than those that pull us apart; We Will Effect Change!"*

--
Dr. Ronel Cook
Deputy Superintendent for Operations
Poughkeepsie City School District
11 College Avenue
Poughkeepsie, NY 12603

<Melton.docx>

--
Dr. Ronel Cook
Deputy Superintendent for Operations
Poughkeepsie City School District
11 College Avenue
Poughkeepsie, NY 12603

--
Dr. Ronel Cook
Deputy Superintendent for Operations
Poughkeepsie City School District
11 College Avenue
Poughkeepsie, NY 12603

**Exhibit G**

# Submission Checklist for Consent Agenda Items

Before the consent agenda item is submitted, ensure that the following is complete by checking the appropriate box:

___New Resolution    _X__ Amended Resolution #_15-741__ and Board meeting date _10/21/15__

- School(s):  Clinton, Krieger, Morse, Warring and Poughkeepsie Middle School

- Program/Initiative Name: 21 Century Community Learning Centers After-School and Saturday Programs

- Program Dates: October 13, 2015- June 14, 2016

- Effective Date of Appointment of Personnel: October 13, 2015

- Rationale for Program/Initiative:  21st Century Community Learning Centers is a federally-funded program which supports the creation of community learning centers that operate programs for students, particularly those who attend high-poverty and low-performing schools, and their families. By providing tutoring and other academic enrichment activities along with a broad array of youth development opportunities that complement their regular academic programs, these centers help students meet state and local student standards in core academic subjects, such as English language arts and math. In addition, literacy and other educational services are offered to families of students participating in the program.

- Academic Return on Investment aligned to Evidence of Success: Goal 1: Academic Achievement. To establish a culture of learning. Strengthen the instructional core– the core includes three interdependent components: *teachers'* knowledge and skill; *students'* engagement in their own learning; and academically challenging content. GOAL 3: Family and Community Communication and Engagement Families, community members, and all stakeholders will experience a customer-service oriented school system with robust, two-way communication processes and clear, transparent, timely communication about the Poughkeepsie City School District. Stakeholders will be engaged as partners in a "collective responsibility" framework.

- Number of Students Served: 900 Students

- Days /Time of Operation of Initiative/Program: Various day, dates and times depending on site from October 13, 2015-June 14, 2016

- 

- Evaluation of Effectiveness of Initiative/Program *(How will the program be evaluated?* Initiative will be evaluated by NYSED, grant funded evaluator, Impact, and by project coordinator and other district personnel.

- Background / Supporting Documentation Attached:

- Funding Source: 21 Century CLC Grant and ESD/SVP Grant

- Person Submitting the Item:  Mrs. Tracy Farrell

## Submission Checklist for Consent Agenda Items

| Name | Position | Hours (Not to exceed) Exact Hours Depend upon the programming scheduled at each site. | Amount |
|---|---|---|---|
| Maria Brown | After-school/Saturday Program Teaching Assistant for Clinton | 330 | $11,880 |
| Terri Zobre Adelma Shillingford Sharon Bridges Diane Lewis | After-school/Saturday Program Teaching Assistant for Krieger (This is a shared position) | 330 | $11,880 |
| Sarah Herman | After-school/Saturday Program Teaching Assistant for Morse | 330 | $11,880 |
| Nicole Logan | After-school/Saturday Program Teaching Assistant for Warring | 330 | $11,880 |
| Helen Purnell | After-school/Saturday Program Teaching Assistant for PMS | 330 | $11,880 |
| Lori Kraus | Substitute | | No Cost |
| Meegan Shea | Substitute | | No Cost |
| Carol Melton | Substitute | | No Cost |
| *Loretta Holloway* | *Substitute* | | *No Cost* |
| *Danielle Omondi* | *Substitute* | | *No Cost* |
| *Tamika Rillie* | *Substitute* | | *No Cost* |
| TOTAL | | | *$59,400* |

BoardDocs® Pro

## Agenda Item Details

Meeting        Nov 16, 2015 - Regular Meeting                     Category

CONSENT - PERSONNEL                                 Subject

Para-Professional Extra-Assignment Appointments        Type
Amendment to Resolution #15-741 from the October 21,
2015 Board of Education Meeting – Amended Resolution.

Action                                              Recommended
                                                    Action

a. BE IT RESOLVED, that the following individuals be
appointed to the following extra-assignment part-time
position of Teaching Assistant at Clinton, Krieger, Morse,
Poughkeepsie Middle School and Warring for 21st Century
Community Learning Centers After-School and Saturday
Programs, effective October 13, 2015 and extending
through June 14, 2016. These positions will be paid for
from the 21st Century Community Learning Centers
Grant and ESD/SVP Grant.

| Name | Position | Hours (Not to exceed) Exact Hours Depend upon the programming scheduled at each site | Amount |
|---|---|---|---|
| Maria Brown | After-school/Saturday Program Teaching Assistant for Clinton | 330 | $11,880.00 |
| Terri Zobre Adelma Shillingford Sharon Bridges Diane Lewis | After-school/Saturday Program Teaching Assistant for Krieger (This is a shared position) | 330 | $11,880.00 |
| Sarah Herman | After-school/Saturday Program Teaching Assistant for Morse | 330 | $11,880.00 |
| Nicole Logan | After-school/Saturday Program Teaching Assistant for Warring | 330 | $11,880.00 |
| Helen Purnell | After-school/Saturday Program Teaching Assistant for PMS | 330 | $11,880.00 |
| Lori Kraus | Substitute | | No Cost |
| Meegan Shea | Substitute | | No Cost |
| Carol Melton | Substitute | | No Cost |
| Loretta Ayers-Holloway | Substitute | | No Cost |
| TOTAL | | | $59,400.00 |

*Amendment*

## Motion & Voting

a. BE IT RESOLVED, that the following individuals be appointed to the following extra-assignment part-time position of Teaching Assistant at Clinton, Krieger, Morse, Poughkeepsie Middle School and Warring for 21st Century Community Learning Centers After-School and Saturday Programs, effective October 13, 2015 and extending through June 14, 2016. These positions will be paid for from the 21st Century Community Learning Centers Grant and ESD/SVP Grant.

Motion by Gregory Charter, second by Raymond Duncan.
Final Resolution: Motion Carries
Yea: Ralph Coates, Raymond Duncan, Gregory Charter, Jacqueline Roman
Nay: Felicia Watson

## Agenda Item Details

Meeting          Oct 21, 2015 - Regular Meeting                    Category

CONSENT - PERSONNEL                                    Subject

Para-Professional Extra-Assignment Appointment -       Type
Resolution #15-741

Action (Consent)                                       Recommended
                                                       Action

a. BE IT RESOLVED, that the following individuals be
appointed to the following extra-assignment part-time
position of Teaching Assistant at Clinton, Krieger, Morse,
Poughkeepsie Middle School and Warring for 21st Century
Community Learning Centers After-School and Saturday
Programs, effective October 13, 2015 and extending
through June 14, 2016. These positions will be paid for
from the 21st Century Community Learning Centers
Grand and ESD/SVP Grant.

| Name | Position | Hours (Not to exceed) Exact Hours Depend upon the programming scheduled at each site | Amount |
|---|---|---|---|
| Maria Brown | After-school/Saturday Program Teaching Assistant for Clinton | 330 | $11,880.00 |
| Terri Zobre Adelma Shillingford Sharon Bridges Diane Lewis | After-school/Saturday Program Teaching Assistant for Krieger (This is a shared position) | 330 | $11,880.00 |
| Sarah Herman | After-school/Saturday Program Teaching Assistant for Morse | 330 | $11,880.00 |
| Nicole Logan | After-school/Saturday Program Teaching Assistant for Warring | 330 | $11,880.00 |
| Helen Purnell | After-school/Saturday Program Teaching Assistant for PMS | 330 | $11,880.00 |
| Lori Kraus | Substitute | | No Cost |
| Meegan Shea | Substitute | | No Cost |
| Carol Melton | Substitute | | No Cost |
| TOTAL | | | $59,400.00 |

## Motion & Voting

Motion to approve Consent Agenda Items.

Motion by Gregory Charter, second by Raymond Duncan.
Final Resolution: Motion Carries
Yea: Ralph Coates, Raymond Duncan, Gregory Charter, Jacqueline Roman, Felicia Watson

**Exhibit H**

NOV 0 2 2015

AFSCME LOCAL _3209_

STEP _2_

 **AFSCME.**
*in the public service*

# OFFICIAL GRIEVANCE FORM

NAME OF EMPLOYEE _Carol Melton_ DEPARTMENT _Paraprofessionals_

CLASSIFICATION _Teacher Assistant_

WORK LOCATION _Morse School_ IMMEDIATE SUPERVISOR _Nadine Dargan –_

TITLE _Teacher Assistant_ Building Principal

STATEMENT OF GRIEVANCE:

List applicable violation: The District violated Article IX – Seniority - Reduction in Force, Section A,
Seniority, Past Practice and any other applicable provisions of the contract when it
made an involuntary transfer for a non-programmatic reason, and when it failed to
consider Seniority as the most important factor in making such a transfer.

Involuntary transfers should not be made unless it is for programmatic reasons only and

Adjustment required: if it is for an actual programmatic reason, then Seniority must be considered as the most
important factor in making transfers within existing jobs as per contract. The affected
employee to be "made whole".

I authorize the A.F.S.C.M.E. Local _3209_ as my representative to act for me in the disposi-
tion of this grievance

Date _11/2/15_ Signature of Employee _Carol Melton_

Signature of Union Representative _Diana Alerman_ Title _Building Rep._

⚹ Date Presented to Management Representative _Becky Torres_

⚹ Signature _Becky Torres   4:00 pm_ Title _Secretary to Superintendent_

Disposition of Grievance: _____

_____

THIS STATEMENT OF GRIEVANCE IS TO BE MADE OUT IN TRIPLICATE. ALL THREE ARE TO BE
SIGNED BY THE EMPLOYEE AND/OR THE AFSCME REPRESENTATIVE HANDLING THE CASE.

ORIGINAL TO _Dr. Nicole Williams, Superintendent_

COPY _Lesley Callis – President, Local 3209, & Mark Teig - Area Representative, AFSCME Council 66_

COPY: LOCAL UNION GRIEVANCE FILE

NOTE: ONE COPY OF THIS GRIEVANCE AND ITS DISPOSITION TO BE KEPT IN GRIEVANCE
FILE OF LOCAL UNION.

THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES   F29

## MEMORANDUM OF AGREEMENT

BY AND BETWEEN THE SUPERINTENDENT OF SCHOOLS AND BOARD OF EDUCATION OF THE POUGHKEEPSIE CITY SCHOOL DISTRICT, hereinafter referred to as "the District" and AFSCME Local 3209 POUGHKEEPSIE SCHOOL DISTRICT PARAPROFESSIONALS ASSOCIATION, hereinafter referred to as "the Association";

WHEREBY the District and Association agree to revise and incorporate the provisions of the Collectively Negotiated Agreement that expired on June 30, 2012, into a new seven (7) year successor agreement effective July 1, 2012 and ending June 30, 2019, except as modified by the following provisions:

WHEREAS, the District and the Association agree as follows:

1. **Article VI Wages** – Revise Article VI to add an additional subparagraph to paragraph A that states the following:

    a. Health Aides

        i. Upon ratification of this Memorandum of Agreement the hourly wage for health aides will increase from $10.77 per hour to $11.00 per hour.

        ii. 7/1/17 Increase the hourly wage of Health Aides from $11.00 per hour to $11.15 per hour.

        iii. 7/1/18 Increase the hourly wage of Health Aides from $11.15 per hour to $11.25 per hour.

    b. All other members of the bargaining unit except for Health Aides that are on the step schedule will receive the following increases:

        i. 7/1/12 Step only

        ii. 7/1/13 Step only

        iii. 7/1/14 Step only

        iv. 7/1/15 Step only

        v. 2016 - At ratification a one-time $500 off schedule payment plus step.

        vi. 7/1/17 1.5% off schedule bonus payment that is not added to base salary, and plus step for any employee on the step schedule.

        vii. 7/1/18 1.5% salary increase plus step movement.

1

2. **Article IV - Hospitalization Insurance and Dental Plan**

    a. Add a new paragraph to Article IV, Sec. 1 that states: "Health Aides may purchase health insurance offered to all other School District employees at full cost of such insurance."

3. **Article V – Retirement** – Unit members, except for health aides, hired on or after December 1, 2016 who have worked for the District for at least ten years and who retire from the District for the purpose of receiving retirement benefits from the New York State Retirement System will be eligible to receive health insurance in retirement on the same plan that they were on in their last year of employment at the same employee contribution rate. However, unit members who in their last year of employment were on a family plan will be able to select either a family plan, 2 person plan, if available, or an individual plan. Unit members who were on an individual plan in their last year of employment will only be eligible for an individual plan in retirement.

    Unit members, except for Health Aides, hired before December 1, 2016, who retire from the District with ten years of service, for the purposes of receiving retirement benefits from the New York State Retirement System, will be eligible to receive health insurance in retirement on the same plan that they were on in their last year of employment at no cost to the unit member. However, unit members who in their last year of employment were on a family plan will be able to select either a family plan, 2 person plan, if available, or an individual plan in retirement. Unit members who were on an individual plan in their last year of employment will only be eligible for an individual plan in retirement.

4. **Article III, Leave Policy, Section 4 Personal Leave** (page 3) – Effective July 1, 2016, delete last sentence of Section 4.

5. **Article IV, Hospitalization Insurance and Dental Plan, Section 3, Health Insurance Buyout** – (page 5). Add a new sentence to the first paragraph that states effective July 1, 2016, the buyout shall equal $1,400 for five buyouts or less, and shall increase to $2,000 for six or more buyouts.

6. **Management Rights Clause – New Article** - It is the right of the District to unilaterally determine the standards of services to be offered by the District, direct its employees; take disciplinary action; maintain the efficiency of governmental operations; determine the methods, means and personnel by which government operations are to be conducted and exercise complete control and discretion over its organization.

7. **New Article – Legislative Authority**

    Add a new Article entitled Legislative Authority that states the following:

    **"IT IS AGREED BY AND BETWEEN THE PARTIES THAT ANY PROVISION OF THIS AGREEMENT REQUIRING**

**LEGISLATIVE ACTION TO PERMIT ITS IMPLEMENTATION BY AMENDMENT OF LAW OR BY PROVIDING THE ADDITIONAL FUNDS THEREFOR, SHALL NOT BECOME EFFECTIVE UNTIL THE APPROPRIATE LEGISLATIVE BODY HAS GIVEN APPROVAL."**

8. **Article VIII Individual & Association Rights** Add a new section 16 entitled Safety Committee that states the following:

   a. The Employer and Union agree to jointly establish a safety and health committee consisting of two (2) members of the District and two (2) union representatives which may meet up to four (4) times per year to discuss any safety issues that the Union or the District wishes to raise at such meeting. Two (2) weeks prior to each meeting the party requesting the meeting shall provide the other with an agenda of Safety issues to be discussed at such meeting.

9. **Article VII Settlement of Disputes:**

   a. Delete the current language and replace it with the following:

   Section 1. Grievance Definition

   A grievance shall be defined to be any claimed violation or misinterpretation of a specific provision(s) set forth in this agreement. Grievances shall be settled in the following manner:

   Step 1

   The Union Steward or other authorized representative of the Union, with or without the employee, shall take up the grievance or dispute with the employee's immediate supervisor within thirty (30) calendar days of its occurrence. If at any time the Steward or any other authorized representative of the Union is unaware of the grievance he/she shall take it up within thirty (30) calendar days of tis occurrence. If at any time the Steward or any other authorized representative of the Union is unaware of the grievance he/she shall take it up within thirty (30) calendar days of his knowledge of its occurrence or when he or she should have known of the grievance. The supervisor shall then attempt to adjust the matter and shall respond within seven (7) work days.

   Step 2

   If the grievance has not been settled, it shall be presented in writing by the Union Steward or other authorized representative of the Union to the School District Superintendent within ten (10) work days after the supervisor's response is due. At the Union's option, a meeting shall be

3

held with the Superintendent of Schools regarding the grievance. The School District Superintendent or his or her designee shall respond in writing to the Union Steward or other authorized representative of the Union within seven (7) work days.

Step 3

If the grievance remains unresolved, it shall be presented by the Union President and/or his or her authorized representative to the School District Clerk in writing within ten (10) work days after the response of the School District Superintendent is due. The School District Clerk shall present the written grievance to the Board of Education within seven (7) work days. The Board of Education within fifteen (15) work days of such receipt shall set forth an answer in writing to the Local Union President, with copies to each member of the Union Grievance Committee.

*Prior to a Grievance proceeding to Step 4, the parties agree that at the request of either side, a Labor-management meeting comprised of the Grievance Chair and/or Grievance Co-Chair, Grievant, District School Board and/or District School Board Designee(s) will be held within fifteen (15) days of the request of either party. At this Labor-Management meeting, any grievance not yet resolved, prior to submission to Step 4 shall be placed upon the agenda for discussion and resolution by the Labor-Management Committee. If the Grievance still remains unresolved, it shall then proceed to Step 4 and be submitted to arbitration. If following the request of either party to hold the Labor-Management meeting a Labor-Management meeting is not held within thirty (30) days following the written request then either party is free to proceed to Step 4.*

Step 4

*If the grievance is not settled at the Labor-Management meeting described in Step 3 above, either party may, by written notice to the other, within thirty (30) days after the Board's decision at Step III, move the grievance to arbitration unless the parties mutually agree to submit the grievance to Med/Arb as established by the Public Employment Relations Board.*

*If a request for Med/Arb is denied, then the Board of Education Clerk shall notify one of the six (6) arbitrators named below, in rotating order, to the extent practicable, of the need to arbitrate:*

*1. David N. Stein*
*2. John Trela*
*3. Louis Patack*
*4. Sheila Cole*

4

5. *Barbara Zausner*
6. *Jeffrey Selchick*

a. The decision of the Arbitrator *whether in Med/Arb or a standard Arbitration* shall be final and binding on the parties, and the Arbitrator shall be requested to issue his or her decision within thirty (30) days after the conclusion of testimony and argument.

b. No Arbitrator functioning under this step of the grievance procedure *whether in Med/Arb or a standard arbitration* shall have any power to amend, modify or delete any provision(s) of this Agreement

c. Expenses for the Arbitrator's services *in Med/Arb or a standard arbitration* shall be borne equally by the Employer and the Union, if either party desires a verbatim record of the proceedings, it may cause such record to be made, provided that it pays for the record and makes copies available without charge to the other party and the Arbitrator.

b. Add a new sub paragraph (c) to Article VII, Sec. 2., that states the following:

"In the case of a group, policy or organization type grievance, the grievance may be submitted directly to the Assistant Superintendent of Human Resources office or their designee by the Union representative.

c. Add a new Section 5 to Article VII, that states the following:

Upon request of either party, conferences shall be held between representatives of the Employer and not more than three (3) representatives of the Union (unless a larger number is agree to by the Employer) on important matters, which may include the discussion of a procedure for avoiding future grievances, resolving workplace issues and other methods of improving the relationship between the parties. The meeting shall be conducted on a quarterly basis. Arrangements for such meeting shall be made in advance, and shall be held at reasonable hours as mutually agreed upon by the parties. Employees acting on behalf of the Union shall suffer no loss of time or pay should such meetings fall within their regular work hours.

**SO AGREED this ___ day of November 2016 subject to approval by the parties' respective constituencies.**

THE DISTRICT                           THE POUGHKEEPSIE PUBLIC SCHOOL
                                       PARAPROFESSIONALS ASSOCIATION

BY: _____            BY: _____

5

BY:_____        BY:_____

BY:_____        BY:_____

BY:_____        BY:_____

AGREEMENT

BETWEEN

POUGHKEEPSIE CITY SCHOOL DISTRICT

AND

THE ASSOCIATION OF POUGHKEEPSIE PUBLIC SCHOOL
PARAPROFESSIONALS, LOCAL 3180-B - COUNCIL 66
AFSCME, AFL-CIO

JULY 1, 2007 - JUNE 30, 2012

## TABLE OF CONTENTS

PAGE

ARTICLE I - PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE II - NEGOTIATING UNIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE III - LEAVE POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Section 1.  Sick Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Section 2.  Retirement/Death Sick Leave Conversion . . . . . . . . . . . . . . . . . . . . . 2
    Section 3.  Bereavement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 4.  Personal Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Section 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Section 6.  Workers' Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARTICLE IV - HOSPITALIZATION INSURANCE AND DENTAL PLAN . . . . . . . . . . . . 4
    Section 1.   Health Insurance Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 2.   Substitution of Health Insurance Plan . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 3.   Health Insurance Buy-Out . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 4.   Sick Leave Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 5.   Group Disability and Other Insurance . . . . . . . . . . . . . . . . . . . . . . . 6
    Section 6.   Vision Coverage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE V - RETIREMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 2.   Retirement Incentive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE VI - SALARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Longevity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARTICLE VII - SETTLEMENT OF DISPUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 1.   Grievance Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Section 2.   Matters Relevant to Grievance Procedures . . . . . . . . . . . . . . . . . . 11
    Section 3.   Stewards and Grievance Committee . . . . . . . . . . . . . . . . . . . . . . . 12
    Section 4.   Processing Grievances During Working Hours . . . . . . . . . . . . . . 12

ARTICLE VIII - INDIVIDUAL AND ASSOCIATION RIGHTS . . . . . . . . . . . . . . . . . . . . 12
    Section 1.  Job Status Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Section 2.  Notice of Assignment, Workday and Extended Workday and Work
            Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Section 3.  Assignments with Teacher Presence . . . . . . . . . . . . . . . . . . . . . . . . 14
    Section 4.  Vacancies and New Positions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Section 5.   Substitute Teaching . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## TABLE OF CONTENTS (continued)

PAGE

Section 6.   Teaching Assistants ..................................... 15
Section 7.   Use of Own Vehicles .................................... 15
Section 8.   Personnel File.......................................... 15
Section 9.   Evaluation .............................................. 15
Section 10.  In-Service Training ..................................... 15
Section 11.  Association Rights ...................................... 16
Section 12.  Use of Facilities ....................................... 16
Section 13.  Union Leave ............................................ 16
Section 14.  Checkoff of Union Dues ................................ 16
Section 15.  Agency Shop Fees ...................................... 17

ARTICLE IX  - SENIORITY - REDUCTION IN FORCE ........................ 18

ARTICLE X  - PROFESSIONAL MEETINGS ................................. 19

ARTICLE XI - NO-STRIKE CLAUSE ...................................... 19

ARTICLE XII - LEGISLATIVE APPROVAL ................................. 19

ARTICLE XIII -- DURATION ............................................ 19

SALARY SCHEDULES ................................................... 21
        2007-2008  ................................................. 21
        2008-2009  ................................................. 22
        2009-2010  ................................................. 23
        2010-2011  ................................................. 24
        2011-2012  ................................................. 25

## ARTICLE I.        PARTIES

This is a contract between the City of Poughkeepsie School District, 11 College Avenue, Poughkeepsie, New York, hereinafter referred to as the "District", and the Association of Poughkeepsie Public School Paraprofessionals, Local 3180-B, Council 66, AFSCME, AFL-CIO, c/o the President of the Unit, 11 College Avenue, Poughkeepsie, New York, 12603, hereinafter referred to as the "Association", over the terms and conditions of employment of the members of the negotiating unit represented by the Association. **All references to employees in this Agreement designate both sexes and whenever the male gender is used it shall be construed to include male and female employees.**

## ARTICLE II.        NEGOTIATING UNIT

The Association has been certified as the exclusive representative for the purpose of collective negotiations and the settlement of grievances of a negotiating unit defined as: All regular full-time teacher aides, classroom aides, health aides, school community workers, family aides and teaching assistants, hereinafter referred to as employees.

## ARTICLE III.        LEAVE POLICY

### Section 1. Sick Leave

Employees shall be entitled to fourteen (14) sick leave days per year. All such leave shall be cumulative to a maximum of 140 days. **Four (4)** of such days may be used for illnesses in the employee's immediate family. Immediate family shall be defined as mother, father, husband, wife, children, or in lieu thereof, some other individual designated by the employee who resides in the

1

same household with the employee.

Section 2. Retirement/Death Sick Leave Conversion

In the event of termination of services of an employee in the unit, payment of accumulated unused sick leave shall be made under the following conditions:

A.    The employee must have had at least seven (7) years of regular employment by the Board; and

B.    There must be at least thirty (30) days of such accumulated leave; and

C.    With respect to retirement, the employee must give the Board at least three (3) months notice in advance of the intended date of retirement; and

D.    Payment shall be made at the rate of **$42.00 per day, up to a maximum $3,500.00 cap for the remainder of all accumulated sick days.**

Section 3. Bereavement

Full-time employees shall be granted five (5) days leave without deduction of pay for absence due to the death of their father, mother, husband, wife, children, brother or sister or such other person designated by the employee on a form supplied by the Business Office.

Full-time employees shall be granted three (3) days leave without deduction of pay for absence due to death of their mother-in-law, father-in-law, sister-in-law, brother-in-law, grandparent, grandchild, daughter-in-law, son-in-law, or such other relative who shall have been living under the same roof as the employee but not included in the paragraph above.

Full-time employees shall be allowed one (1) day's leave without reduction of pay for absence due to the death of their niece, nephew, aunt, uncle or first cousin, except that in the case where travel is required for a one-day distance beyond a 150 mile radius, two (2) days leave may be allowed

2

without deduction of pay.

Individual adjustments may be made for members of the staff.

Section 4. Personal Leave

Each employee shall be allowed two (2) days per year without a deduction of pay for the purpose of conducting personal business. Leave for personal business shall not be granted unless a written request is made to the Superintendent of Schools through the Principal, and the time thereof shall be subject to approval by the Superintendent. Leave for personal business will not be granted for any business which can be conducted during time other than the times during which the employee is employed by the District. All written requests for leave for personal business must include the specific reason for personal purposes. At the end of each year, unused personal leave days may be rolled over into accumulated sick leave.

Section 5.

The Board of Education may grant a leave of absence to a bargaining unit member with or without pay. The application for such leave shall include child rearing leave and family related leaves. To be entitled to such leave, the employee must furnish the District with a written application setting forth the proposed dates of the planned leave, which shall, in no event, exceed one year, with a minimum of sixty (60) days prior notice to the commencement date of the leave. The sixty (60) day minimum may be waived at the sole discretion of the Superintendent of Schools and an extension of such leave may be granted for up to an additional year at the sole discretion of the Superintendent of Schools where application for the same is made in writing upon at least sixty (60) days notice.

Section 6. Workers' Compensation

In the event of an injury covered by Workers' Compensation, the District shall make normal

3

R.V.

salary payments to the unit member to the extent of the unit member's accumulated sick leave and the District shall receive the advance salary payment reimbursement from Workers' Compensation Insurance. Upon receipt of such reimbursement, the District shall reinstate the unit member's sick leave on a pro-rated basis (i.e., ratio based upon the value of the workers' compensation per diem reimbursement to a day's pay).

## ARTICLE IV.        HOSPITALIZATION INSURANCE AND DENTAL PLAN

### Section 1. Health Insurance Benefits

The Board shall pay the entire cost of the Dutchess Alternate PPO Plan effective July 1, 2004, on the individual and on the family plan, as selected by the employee or retiree, and each employee or retiree shall have the right to opt for HMO coverage whereupon the District's obligation to pay premium costs shall be up to the costs of individual or family coverage under the District's health insurance plan.

**Effective February 1, 2008, all employees who select individual or family coverage shall be required to contribute 1% of the premium; effective July 1, 2008, 2% of the premium for each such coverage; effective July 1, 2009, 3% of the premium for each such coverage; effective July 1, 2010, 4% of the premium for each such coverage; effective July 1, 2011, 5% of the premium for each such coverage to defray the District's cost in providing individual or family health insurance coverage.**

### Section 2. Substitution of Health Insurance Plan

The parties agree that the Board may change health insurance plans without further negotiations to the Dutchess Plan or an alternative plan providing comparable coverage to that

R.D.

offered by the State Health Insurance Plan or the Dutchess Plan. However, prior to implementing

a change, the Association shall be notified so that it might give its input on the issue of comparability

at least 60 days prior to the effective date of any change. In the event that the Association disagrees

with the District's determination with respect to comparability, the parties agree to submit the matter

to final and binding arbitration before an Arbitrator selected pursuant to the rules and procedures of

the American Arbitration Association Labor Arbitration Panel.

Section 3. Health Insurance Buy-Out

Unit members who are otherwise health insured may opt-out of the District's health insurance

program and receive a payment of **$1,400.00 per annum, effective July 1, 2007.**  Payment is to be

made in ten (10) monthly installments so long as the employee remains employed in the district.

A.     Notice of opting-out and proof of alternative health insurance coverage must be

provided to the School Business Official, in writing, by no later than June 1st for opting-out effective

July 1st

B.     Re-entry into the District's Health Insurance Program shall be allowed at any time,

subject only to the waiting period, if any, of the District's Health Insurance Program rules and

regulations. Upon re-entry the monthly payments shall cease.

C.     New hires may opt-out and receive this benefit on a pro-rated basis, where

applicable, at the time of hire, provided that proof of other health insurance is furnished to the School

Business Official.

Section 4. Sick Leave Bank

Unit members who elect to participate in the sick leave bank shall submit to the Board a

waiver of no more than one (1) day of accumulated sick leave. The Union shall contribute no more

days than the number of employees in the bargaining unit which number shall be matched by the Board. All employees of the unit shall be eligible to contribute sick leave days, but employees not electing to waive one day, shall not be eligible to receive time from the sick bank. **It shall be an additional prerequisite that before any unit employee is eligible to receive time from the sick bank, he/she must have completed one (1) full school year of service and have five (5) sick leave days remaining at the time of application.** The Bank shall be administered by a committee of three (3) representatives appointed by the Board and three (3) representatives appointed by the Union who shall act upon withdrawals.

Withdrawals from the sick bank shall be limited to unit members who have contributed to the bank and are involved in an extended disability resulting from illness or accident and who have exhausted their sick leave, vacation, and personal leave days. The decision of the above committee shall be final and binding upon the unit member, the Board and the Union with respect to the administration of the sick leave bank, however, no unit member may receive more than fifty (50) days from the sick leave bank. Prior to granting a request for use, the District shall have the right to require the unit member to submit to a medical examination at the District's expense and have the evidence of such examination considered by the sick leave bank committee.

The sick leave bank shall be renewable only once during the fiscal school year, provided all sick leave bank days have been exhausted.

Section 5. Group Disability and Other Insurance

Unit members may opt to purchase group disability and other insurance the Unit wishes, through payroll deduction at no cost to the District, provided such is permitted under IRS regulations.

## Section 6. Vision Coverage

Effective July 1, 1994, the District shall pay the entire cost of individual coverage for unit members to be enrolled in the current vision plan or its substantial equivalent. Unit members shall be eligible to purchase family coverage so long as they notify the Business Office by May 15th.

## ARTICLE V.        RETIREMENT

### Section 1.

The District shall maintain its present retirement plan for employees.

### Section 2. Retirement Incentive

Unit members who have at least reached the minimum age of eligibility to retire and receive benefits from the New York State Retirement System and who have served for ten years or more in the Poughkeepsie City School District shall be entitled to 50% of the final years salary, up to $10,000.00, provided that retirement is announced to be effective on June 30th of the year in which these conditions are met. Notice of retirement shall be submitted in writing on or before December 1st in the year of eligibility. The retirement referenced above shall be paid between June 30th and November 1st of the calendar year of the effective date of retirement.   On June 30, 2012, this provision shall sunset, becoming null and void in all regards except for the purpose of enforcing the benefits conferred upon those who opted to retire during the years specified above.

## ARTICLE VI.        SALARIES

A.    Effective July 1, 2007, the salary schedule shall be developed by increasing each step of the 2006-2007 schedule by 5%.  Effective July 1, 2008, the salary schedule shall be developed by increasing each step of the 2007-2008 schedule by 5%. Effective July 1, 2009, the salary schedule shall be developed by increasing each step of the 2008-2009 schedule by 4.5%. Effective July 1, 2010, the salary schedule shall be developed by increasing each step of the 2009-2010 schedule by 3.75%.  Effective July 1, 2011, the salary schedule shall be developed by increasing each step of the 2010-2011 schedule by 3.75%.

Effective July 1, 2007, any member having an associate's degree, bachelor's degree or the equivalent shall be paid differentials added to their yearly salary as follows:

|  | 07/01/07 | 07/01/08 | 07/01/09 | 07/01/10 | 07/01/11 |
|---|---|---|---|---|---|
| Associate's | $ 700.00 | $ 900.00 | $1,100.00 | $1,300.00 | $1,500.00 |
| Bachelor's | $1,250.00 | $1,500.00 | $1,750.00 | $2,000.00 | $2,250.00 |

B.    During each year of this Agreement, unit members who are eligible to advance a step on the schedule shall do so.

C.    Longevity - Every year during the term of this Agreement, every employee having at least five (5) years of continuous service in positions within the bargaining unit shall receive, in addition to the salary provided in the annexed schedules, a longevity increase as follows:

8

R.P.

<u>2007-2012</u>

After Completion of
Years of Continuous Service

Longevity Increases
(Dollar amounts to be added after the percentage
increase to the salary schedule is applied to the
previous year's longevity amount)

| | 07/01/07 | 07/01/08 | 07/01/09 | 07/01/10 | 07/01/11 |
|---|---|---|---|---|---|
| 5 Years | 5%+$50 | 5%+$50 | 4.5%+$50 | 3.75%+$50 | 3.75%+$50 |
| 10 Years | 5%+$50 | 5%+$50 | 4.5%+$50 | 3.75%+$50 | 3.75%+$50 |
| 13 Years | 5%+$50 | 5%+$50 | 4.5%+$50 | 3.75%+$50 | 3.75%+$50 |
| 15 Years | 5%+$50 | 5%+$50 | 4.5%+$50 | 3.75%+$50 | 3.75%+$50 |
| 18 Years | 5%+$50 | 5%+$50 | 4.5%+$50 | 3.75%+$50 | 3.75%+$50 |
| 20 Years | 5%+$50 | 5%+$50 | 4.5%+$50 | 3.75%+$50 | 3.75%+$50 |
| 25 Years | 5%+$50 | 5%+$50 | 4.5%+$50 | 3.75%+$50 | 3.75%+$50 |

The aforesaid longevity increases are cumulative. For the purpose of this Agreement, unit members presently eligible for longevity shall be entitled to longevity increases reflecting a cumulative amount corresponding to their present years of continuous service in positions in the bargaining unit.

## ARTICLE VII.   SETTLEMENT OF DISPUTES

### Section 1.   Grievance Definition

A grievance shall be defined to be any claimed violation or misinterpretation of a specific provision(s) set forth in this agreement. Grievances shall be settled in the following manner:

### STEP 1.

The Union Steward or other authorized representative of the Union, with or without the employee, shall take up the grievance or dispute with the employee's immediate supervisor

R.D.

within thirty (30) calendar days of its occurrence.  If at any time the Steward or any other authorized representative of the Union is unaware of the grievance he/she shall take it up within thirty (30) calendar days of his knowledge of its occurrence or when he or she should have know of the grievance.  The supervisor shall then attempt to adjust the matter and shall respond within seven (7) work days.

STEP 2.

If the grievance has not been settled, it shall be presented in writing by the Union Steward or other authorized representative of the Union to the School District Superintendent within ten (10) work days after the supervisor's response is due.  At the Union's option, a meeting shall be held with the Superintendent of Schools regarding the grievance.  The School District Superintendent or his designee shall respond in writing to the Union Steward or other authorized representative of the Union within seven (7) work days.

STEP 3.

If the grievance still remains unresolved, it shall be presented by the Union President and/or his authorized representative to the School District Clerk in writing within ten (10) work days after the response of the School District Superintendent is due.  The School District Clerk shall present the written grievance to the Board of Education within seven (7) work days.  The Board of Education within fifteen (15) work days of such receipt shall set forth an answer in writing to the Local Union President, with copies to each member of the Union Grievance Committee.

STEP 4.

If the Grievance is still unsettled within ten (10) days after the meeting of the Union

R.V.

Grievance Committee and the School Board, either party may, by written notice to the other, request arbitration, whereupon the Board of Education Clerk shall notify one of the five arbitrators named below, in rotating order, to the extent practicable, of the need to arbitrate:

1. Herbert Haber
2. Janet Spencer
3. Carol Wittenberg
4. Jeffrey Selchick
5. Howard Edelman

a.  The decision of the Arbitrator shall be final and binding on the parties, and the Arbitrator shall be requested to issue his decision within thirty (30) days after the conclusion of testimony and argument.

b.  No Arbitrator functioning under this step of the grievance procedure shall have any power to amend, modify or delete any provisions of this Agreement.

c.  Expenses for the Arbitrator's services and the proceedings shall be borne equally by the Employer and the Union, if either party desires a verbatim record of the proceedings, it may cause such a record to be made, providing it pays for the record and makes copies available without charge to the other party and the Arbitrator.

Section 2.   Matters Relevant to Grievance Procedures

a.  The time limits in the grievance procedure may be extended by mutual agreement in writing; provided, however, that notwithstanding any other provision in this article of the agreement any grievance that has not been filed in writing at Step 2 within forty (40) calendar days of the time when the grievant or Union representative knew or should have known that a grievance has occurred shall be deemed waived and will not be further processed through

11

R.P.

the grievance procedure.

b.    Any step of the grievance procedure may be by-passed by mutual agreement, in writing.

Section 3.    Stewards and Grievance Committee

a.    Employees selected by the Union to act as Union representatives shall be known as "stewards". The names of the employees selected as stewards and the names of other Union officers and representatives who may represent employees shall be certified in writing to the Employer by the Local Union, and the individuals so certified shall constitute the Union Grievance committee.

b.    If the employee is summoned for disciplinary action and desires a Union Representative to be present at the scheduled time, the Union Representative shall be allowed to be present.

Section 4.    Processing Grievances During Working Hours

a.    The Union Steward and any other authorized Union Representatives may investigate and process grievances arising under this Agreement during working hours without loss of pay, only when absolutely necessary.

ARTICLE VIII.    INDIVIDUAL AND ASSOCIATION RIGHTS

Section 1.    Job Status Form

By no later than October 30th of each school year, the District shall make available to each employee, a form sheet showing the salary, seniority and accrued time of said employee.

12

RR.

<u>Section 2.   Notice of Assignment, Workday , Extended Workday and Work Year</u>

All regular employed unit members will be required to work a minimum of **184 days in each work year, effective July 1, 2007.** At the beginning of each school year, each unit employee shall receive a written job description specifying that person's assignment; provided, however, that employees undertaking new assignments may be given their job specifications no later than the second week following such assignment.

Unit members shall work the teachers' workday in the building where assigned. Work beyond the normal time of the workday shall be governed by the following provisions, unless addressed at Article X (Professional Meetings).

A.   Permanent - involving at least one (1) hour of work each day or on a regularly scheduled basis, each week, throughout the school year, (i.e., M, F or T, W, F). In the event that fewer than all positions are required for permanent assignment, on a building seniority basis, the voluntary/involuntary/hardship process described in paragraph "B", below, shall apply.

B.   Occasional - involving at least one (1) hour of additional work before or after the regular hours of the workday of unit members on an as-needed basis; provided, however, that such assignments shall be based upon a volunteers first, followed by involuntary assignment upon the inverse order of seniority. The parties shall determine hardship exemptions to making involuntary assignments.

C.   New hires (on or after November 16, 1987) shall not be entitled to hardship consideration.

D.   The rate of pay for service under paragraphs "A" and "B", above, shall be at 1-1/4 straight time pay based upon the individuals hourly rate, with such services to date being so

R.D.

compensated for, offset by pay or compensatory time already given.

Section 3.    Assignments with Teacher Presence

Unit employees, other than teaching assistants, shall not be given classroom assignments where students are to be supervised without direct teacher presence.

The District will make every reasonable effort to assure that teacher aides are not directly charged with student instructional supervision on days when the teacher is present.

Section 4.    Vacancies and New Positions

Notice of vacancies and new positions in the unit shall be made known to the Association President and posted prior to being filled. The posting shall include a general description of the job. Consideration shall be given to members of the bargaining unit. Qualification shall be determined finally by the Superintendent of Schools.

Section 5.    Substitute Teaching

a.    **Teaching Assistants who substitute and/or cover for absent teachers shall be paid the rate of $9.00 per period.**

b.    Teaching Assistants who cover during homeroom shall not receive compensation for such activities.

In order to be paid for such work, the employee must be assigned by his/her supervisor and shall be required to submit a voucher to the District that shall be signed by the Building Principal. The unit member may expect to be the first choice for substituting in his/her classroom and receive preference for substituting, except with respect to substitute teachers, when teachers are absent in his/her area of speciality in his/her building.

14



Section 6.   Teaching Assistants

Upon recommendation of the Supervising Administrator(s) with the approval of the Superintendent, all paraprofessional employees meeting the requirements of law for the position of Teaching Assistants shall be so designated.

Section 7.   Use of Own Vehicles

No paraprofessional shall be directed, nor shall a paraprofessional be expected to utilize his or her vehicle for school district purposes.

Section 8.   Personnel File

Each unit member shall be notified if any derogatory or adversely critical evaluative materials are to be placed in the employee's personnel file. Such materials must be shown and a copy furnished to the paraprofessional before being placed in the file and the employee may place a rebuttal statement in the file answering the criticism as set forth in the material submitted to the file.

Section 9.   Evaluation

Unit members shall be informed of the District's evaluation procedure by no later than October 1, 1981. If a teacher's negative report may lead to the discipline or discharge of a unit member, such unit member shall have the right to an independent evaluation by an Administrator.

Section 10.   In-Service Training

Aides and assistants may be allowed to attend District-sponsored in-service workshops related to unit work on an equitable basis. Such attendance shall not unreasonably be withheld. For each one (1) hour or more of District-sponsored in-service course work, the paraprofessional shall receive the sum of $11.00 per hour in 2004-05 and $12.00 per hour effective July 1, 2005, following submission of their certificate to the Personnel Office, on or before October 1st and February 1st of

the school year when their certificate was issued.  Payment shall be promptly made thereafter.

Section 11.    Association Rights

The PPSPA shall have reasonable access to such information contained in the public records of the Poughkeepsie City School District, as is necessary to conduct its business such as payroll, salary, etc., both present and for preceding years, lists of all unit employees employed by the School District including all federally funded positions and Civil Service employees, provisional as well as permanent.

Section 12.    Use of Facilities

The District will provide bulletin board privileges, inter-school mailing facilities and meeting spaces for the PPSPA upon request by the Union President provided that the same shall not interfere with the educational process of the School District and shall not involve an extra expense for the Board.

Section 13.    **Union Leave**

**Each school year, the Association President or designee, all union officers and shop stewards shall be entitled to up to twelve (12) one-half days off, with pay, for the purpose of conducting or participating in PPSPA and union business; provided, however, that only four such half days off may be used by Union Officers other than the President.**

Section 14.   Checkoff of Union Dues

**a.    All employees covered by this Agreement may tender their membership dues to the Union by signing the authorization for Payroll Deduction of Union Dues Form provided by the Union.**

**b.    The Employer agrees to deduct Union membership dues in accordance with the**

16

amount certified by the Union to the Employer and to maintain such dues deductions in accordance with the terms and conditions of the form of Authorization for Payroll Deduction of Union Dues provided by the Union from the pay of all employees who have executed such authorization for payroll deduction of Union dues and Insurance deductions made available through the Union.

    c.    Payroll deduction of Union Dues under the properly executed Authorization for Payroll Deduction of Union Dues Forms shall become effective at the time the form is signed by the employee and shall be deducted by the next full pay period thereafter from the pay of the employee.

    d.    The aggregate total of such deductions shall be remitted each month to the designated financial officer of the Union together with a list from whom dues have been deducted and shall be done on a bi-weekly basis.

    e.    Revocation of authorization cards shall be subject to conditions contained thereon.

    f.    Any changes in the amount of Union Dues to be deducted must be certified by the Union in writing and be forwarded to the Employer.

    g.    The Employer agrees to grant exclusive rights of dues deduction to the Union and will deduct Union membership dues from the pay of those employees who individually request in writing that such deductions be made.  The amount to be deducted shall be certified to the Employer by the Union and the aggregate deductions together with a list of employees from whom deductions were made shall be remitted forthwith to the Union.

Section 15.    Agency Shop Fees

    a.    Any present or future employee who is not a Union member shall pay to the Union each month a service charge which shall be called an Agency Shop fee. Such Agency Shop fee shall be an amount equal to the regular monthly dues of this Union.

b.   The Employer agrees to deduct Agency Shop fees each pay period from the pay of the employee.

c.   The aggregate total of such deductions shall be remitted each month to the designated financial officer of the Union together with a list from whom Agency Shop fees have been deducted and shall be done on a bi-weekly basis.

d.   The Union agrees that the School District's sole obligation regarding the payment of agency shop fees to the Union shall be the payment of the per employee amounts determined by the Union.  The Union further agrees to indemnify and hold the School District harmless against any claim, loss, liability, and expense arising out of or in connection with such dues deduction and the use thereof by the Union.

## ARTICLE IX.      SENIORITY - REDUCTION IN FORCE

A.      Seniority - The Employer and the Union shall jointly establish a seniority list by job title. Seniority shall be the most important factor in filling vacant jobs in the School District and in transfers within existing jobs.  **The Employer shall have the authority to make involuntary transfers when deemed necessary by the School District for programmatic reasons.**   If it becomes necessary to reduce the work force, the last person on the seniority list for each job title shall be laid-off first and when the force is again increased, the laid-off person shall be returned to work in reverse order in which lay-offs occurred.  Such recall rights shall exist for one year following any lay-offs for all non-competitive class employees.

B.      For the purposes of this provision, there shall be two job titles: (a) teacher aides and (b) teacher assistants.

C.      Employees laid-off from positions set forth in (b) above, shall be entitled to displace a less senior person in a job title (a) position. However, no employee in job title (a) position may

displace a person of less seniority in a job title (b) position.

     D.    Upon the abolition of a position, an employee exercising displacement rights shall not be reduced in salary or wage when assuming the duties of the displaced employee.

## ARTICLE X.    PROFESSIONAL MEETINGS

Paraprofessionals shall participate in one faculty meeting per month and one open house per year without additional compensation. Services required beyond the above stated, including open house and parent conferences conducted in the evening, shall be compensated at the rate of straight time or time and one-half, where applicable.

## ARTICLE XI.    NO-STRIKE CLAUSE

In consideration of its recognition, the Association affirms that it does not assert the right to strike against the District, nor will it assist nor participate in any such strike by the employees or impose any obligation upon the employees to conduct, assist, or participate in a strike.

## ARTICLE XII.    LEGISLATIVE APPROVAL

It is agreed by and between the parties that any provision in this Agreement requiring legislative action to permit its implementation by amendment of law or by providing the additional funds therefor, shall not become effective until the Board of Education has given approval.

## ARTICLE XIII.    DURATION

The duration of this Agreement shall be from **July 1, 2007 through June 30, 2012. All terms shall be given in effect retroactively to July 1, 2007, unless otherwise indicated.** The above Agreement constitutes all of the agreements reached by the representatives of the

Superintendent of Schools and the Paraprofessional Association at the negotiations leading to this Agreement and all negotiable items have been discussed and the negotiations shall not be reopened during the term of this Agreement. The signatures appearing below indicate agreement to this contract by the Paraprofessional Association, and ratification by a majority of the Board of Education, as reflected in the minutes of the Board of Education. If the Association wishes to negotiate a successor agreement, it shall notify the District in writing on or before March 1, 2007. Negotiations shall commence as soon as practicable thereafter.

DATED:    AUGUST 22, 2007.

**BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF POUGHKEEPSIE**

**THE ASSOCIATION OF POUGHKEEPSIE PUBLIC SCHOOLS PARAPROFESSIONALS, LOCAL 3180-D, COUNCIL 66, AFL–CIO, AFSCME**

BY: _____
    **PRESIDENT**

BY: _____
    **PRESIDENT**

BY: _____
    **CLERK**

BY: _____
    **COUNCIL 66 REPRESENTATIVE**

BY: _____
    **SUPERINTENDENT OF SCHOOLS**

BY: _____

BY: _____

RA

Paraprofessional Salary Schedule 2007-2008

| STEP | NO HIGH SCHOOL DIPLOMA 2007-2008 | HIGH SCHOOL DIPLOMA 2007-2008 | TEACHING ASSISTANT 2007-2008 | ASSOCIATE DEGREE 2007-2008 | BACHELORS DEGREE 2007-2008 |
|---|---|---|---|---|---|
| 1 | 18,389 | 18,550 | 18,733 | 18,915 | 19,226 |
| 2 | 18,736 | 18,922 | 19,107 | 19,293 | 19,610 |
| 3 | 19,111 | 19,300 | 19,489 | 19,679 | 20,003 |
| 4 | 19,493 | 19,686 | 19,880 | 20,073 | 20,403 |
| 5 | 19,883 | 20,079 | 20,278 | 20,476 | 20,810 |
| 6 | 20,281 | 20,482 | 20,682 | 20,883 | 21,227 |
| 7 | 20,686 | 20,892 | 21,097 | 21,301 | 21,651 |
| 8 | 21,100 | 21,309 | 21,519 | 21,728 | 22,085 |
| 9 | 21,522 | 21,735 | 21,948 | 22,161 | 22,526 |
| 10 | 21,952 | 22,170 | 22,387 | 22,605 | 22,976 |
| 11 | 22,392 | 22,614 | 22,835 | 23,057 | 23,435 |
| 12 | 22,839 | 23,065 | 23,292 | 23,519 | 23,904 |
| 13 | 23,295 | 23,527 | 23,758 | 23,988 | 24,382 |
| 14 | 23,762 | 23,998 | 24,233 | 24,469 | 24,870 |
| 15 | 24,236 | 24,478 | 24,717 | 24,959 | 25,368 |

Longevity

|  |  | cumulative |  |
|---|---|---|---|
| 5 | 613 | | 613 |
| 10 | 725 | | 1,338 |
| 13 | 613 | | 1,951 |
| 15 | 613 | | 2,564 |
| 18 | 613 | | 3,177 |
| 20 | 668 | | 3,845 |
| 25 | 1,062 | | 4,907 |

Degree Differentials

| AD | 700 |
|---|---|
| BA | 1250 |

R.D.

Paraprofessional Salary Schedule 2008-2009

| STEP | NO HIGH SCHOOL DIPLOMA 2008-2009 | HIGH SCHOOL DIPLOMA 2008-2009 | TEACHING ASSISTANT 2008-2009 | ASSOCIATE DEGREE 2008-2009 | BACHELORS DEGREE 2008-2009 |
|---|---|---|---|---|---|
| 1 | 19,287 | 19,478 | 19,670 | 19,860 | 20,187 |
| 2 | 19,673 | 19,868 | 20,062 | 20,257 | 20,590 |
| 3 | 20,067 | 20,265 | 20,464 | 20,663 | 21,003 |
| 4 | 20,468 | 20,671 | 20,874 | 21,076 | 21,423 |
| 5 | 20,877 | 21,083 | 21,291 | 21,499 | 21,850 |
| 6 | 21,295 | 21,506 | 21,716 | 21,928 | 22,288 |
| 7 | 21,720 | 21,936 | 22,151 | 22,366 | 22,734 |
| 8 | 22,155 | 22,374 | 22,595 | 22,814 | 23,189 |
| 9 | 22,598 | 22,822 | 23,046 | 23,269 | 23,652 |
| 10 | 23,050 | 23,278 | 23,506 | 23,736 | 24,125 |
| 11 | 23,512 | 23,745 | 23,977 | 24,248 | 24,607 |
| 12 | 23,980 | 24,219 | 24,457 | 24,695 | 25,100 |
| 13 | 24,460 | 24,704 | 24,946 | 25,188 | 25,601 |
| 14 | 24,950 | 25,198 | 25,445 | 25,693 | 26,114 |
| 15 | 25,448 | 25,701 | 25,953 | 26,206 | 26,636 |

Longevity

|  | cumulative |  |
|---|---|---|
| 5 | 694 | 694 |
| 10 | 811 | 1,505 |
| 13 | 694 | 2,199 |
| 15 | 694 | 2,893 |
| 18 | 694 | 3,587 |
| 20 | 751 | 4,338 |
| 25 | 1,165 | 5,503 |

Degree Differentials

| AD | 900 |
|---|---|
| BA | 1500 |

22

Professional Salary Schedule 2009-2010

| STEP | NO HIGH SCHOOL DIPLOMA 2009-2010 | HIGH SCHOOL DIPLOMA 2009-2010 | TEACHING ASSISTANT 2009-2010 | ASSOCIATE DEGREE 2009-2010 | BACHELORS DEGREE 2009-2010 |
|---|---|---|---|---|---|
| 1 | 20,155 | 20,354 | 20,555 | 20,754 | 21,096 |
| 2 | 20,558 | 20,762 | 20,965 | 21,169 | 21,517 |
| 3 | 20,970 | 21,177 | 21,384 | 21,593 | 21,948 |
| 4 | 21,389 | 21,601 | 21,813 | 22,025 | 22,387 |
| 5 | 21,816 | 22,032 | 22,250 | 22,466 | 22,834 |
| 6 | 22,253 | 22,474 | 22,693 | 22,914 | 23,291 |
| 7 | 22,698 | 22,924 | 23,148 | 23,373 | 23,757 |
| 8 | 23,152 | 23,381 | 23,611 | 23,841 | 24,232 |
| 9 | 23,615 | 23,849 | 24,083 | 24,316 | 24,716 |
| 10 | 24,087 | 24,326 | 24,564 | 24,804 | 25,211 |
| 11 | 24,570 | 24,813 | 25,058 | 25,298 | 25,744 |
| 12 | 25,060 | 25,308 | 25,557 | 25,806 | 26,229 |
| 13 | 25,561 | 25,815 | 26,069 | 26,321 | 26,753 |
| 14 | 26,072 | 26,332 | 26,590 | 26,849 | 27,289 |
| 15 | 26,593 | 26,858 | 27,121 | 27,386 | 27,835 |

Longevity

| | | cumulative |
|---|---|---|
| 5 | 775 | 775 |
| 10 | 898 | 1,673 |
| 13 | 775 | 2,448 |
| 15 | 775 | 3,223 |
| 18 | 775 | 3,998 |
| 20 | 835 | 4,833 |
| 25 | 1,267 | 6,100 |

Degree Differentials

| | |
|---|---|
| AD | 1100 |
| BA | 1750 |

R.D.

Paraprofessional Salary Schedule 2010-2011

| STEP | NO HIGH SCHOOL DIPLOMA 2010-2011 | HIGH SCHOOL DIPLOMA 2010-2011 | TEACHING ASSISTANT 2010-2011 | ASSOCIATE DEGREE 2010-2011 | BACHELORS DEGREE 2010-2011 |
|---|---|---|---|---|---|
| 1 | 20,911 | 21,118 | 21,326 | 21,532 | 21,886 |
| 2 | 21,329 | 21,541 | 21,751 | 21,963 | 22,324 |
| 3 | 21,756 | 21,971 | 22,186 | 22,403 | 22,771 |
| 4 | 22,191 | 22,411 | 22,631 | 22,851 | 23,226 |
| 5 | 22,635 | 22,858 | 23,084 | 23,309 | 23,690 |
| 6 | 23,088 | 23,317 | 23,544 | 23,774 | 24,165 |
| 7 | 23,549 | 23,783 | 24,016 | 24,249 | 24,647 |
| 8 | 24,020 | 24,258 | 24,497 | 24,735 | 25,141 |
| 9 | 24,500 | 24,743 | 24,986 | 25,228 | 25,643 |
| 10 | 24,990 | 25,238 | 25,485 | 25,734 | 26,156 |
| 11 | 25,491 | 25,744 | 25,995 | 26,248 | 26,678 |
| 12 | 25,999 | 26,258 | 26,516 | 26,774 | 27,213 |
| 13 | 26,519 | 26,783 | 27,046 | 27,308 | 27,766 |
| 14 | 27,050 | 27,319 | 27,587 | 27,856 | 28,312 |
| 15 | 27,590 | 27,866 | 28,138 | 28,413 | 28,879 |

Longevity

|  |  | cumulative |  |
|---|---|---|---|
| 5 | 854 | | 854 |
| 10 | 982 | | 1,836 |
| 13 | 854 | | 2,690 |
| 15 | 854 | | 3,544 |
| 18 | 854 | | 4,398 |
| 20 | 916 | | 5,314 |
| 25 | 1,365 | | 6,679 |

Degree Differentials

| AD | 1300 |
|---|---|
| BA | 2000 |

24

R.P.

## Paraprofessional Salary Schedule 2011-2012

| STEP | NO HIGH SCHOOL DIPLOMA 2011-2012 | HIGH SCHOOL DIPLOMA 2011-2012 | TEACHING ASSISTANT 2011-2012 | ASSOCIATE DEGREE 2011-2012 | BACHELORS DEGREE 2011-2012 |
|------|------|------|------|------|------|
| 1  | 21,695 | 21,910 | 22,125 | 22,340 | 22,707 |
| 2  | 22,129 | 22,349 | 22,567 | 22,786 | 23,161 |
| 3  | 22,572 | 22,795 | 23,018 | 23,243 | 23,625 |
| 4  | 23,023 | 23,251 | 23,480 | 23,708 | 24,097 |
| 5  | 23,483 | 23,715 | 23,950 | 24,183 | 24,578 |
| 6  | 23,953 | 24,191 | 24,427 | 24,665 | 25,071 |
| 7  | 24,432 | 24,675 | 24,917 | 25,159 | 25,572 |
| 8  | 24,921 | 25,167 | 25,415 | 25,662 | 26,084 |
| 9  | 25,419 | 25,671 | 25,923 | 26,174 | 26,605 |
| 10 | 25,928 | 26,184 | 26,441 | 26,699 | 27,137 |
| 11 | 26,447 | 26,709 | 26,971 | 27,232 | 27,679 |
| 12 | 26,974 | 27,242 | 27,510 | 27,778 | 28,233 |
| 13 | 27,514 | 27,788 | 28,061 | 28,332 | 28,797 |
| 14 | 28,064 | 28,343 | 28,621 | 28,900 | 29,374 |
| 15 | 28,625 | 28,910 | 29,193 | 29,478 | 29,962 |

Longevity

| | | cumulative |
|------|------|------|
| 5  | 936   | 936   |
| 10 | 1,069 | 2,005 |
| 13 | 936   | 2,941 |
| 15 | 936   | 3,877 |
| 18 | 936   | 4,813 |
| 20 | 1,000 | 5,813 |
| 25 | 1,466 | 7,279 |

Degree Differentials

| AD | 1500 |
|----|------|
| BA | 2250 |

25